OPINION
{¶ 1} Defendant-appellant Jerome Brown appeals from his conviction and sentence for Aggravated Robbery, with a two-year firearm specification; Burglary, with a three-year firearm specification; and Felonious Assault, with a three-year firearm specification. Brown contends that his conviction is against the manifest weight of the evidence. Specifically, he contends that the jury's conclusion that he was one of the perpetrators of the offense is against the manifest weight of the evidence.
 {¶ 2} Based upon our review of the evidence in the record, we conclude that the jury could reasonably find, as it evidently did, that Brown was one of the perpetrators of the offense. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Paul Dorsey arrived at his girlfriend's apartment, on Loffer Court, about 8:00 in the evening on November 19, 2001. Loffer Court runs into State Route 741, or Springboro Pike, just north of the Dayton Mall. Dorsey was talking to his girlfriend, Rogetta Rogers, who was not at home at the time, on his cell phone as he entered the apartment.
 {¶ 4} Just after Dorsey entered the apartment and shut the door, he was assaulted by two intruders. Although at one point the intruders turned on the light in the stairway in the apartment, there was never enough light for Dorsey to get a good look at the intruders, one of whom had something like a mask covering his face, and one of whom was wearing a hood on his head. Both intruders were wearing dark clothes. The taller intruder was wearing darker clothing than the shorter intruder. Dorsey could determine that the shorter intruder was black, but could make no determination concerning the taller intruder, who never spoke during the encounter.
 {¶ 5} During the initial struggle, Dorsey sustained a blow to his head, but he does not know whether one of the intruders hit him, or whether he hit his head on a solid object during the struggle. At one point during, or shortly after, the initial struggle, Dorsey saw a gun "pulled towards me." Dorsey tried to grab the gun, but was unsuccessful. The taller intruder held the gun.
 {¶ 6} After Dorsey's unsuccessful attempt to grab the gun, one of the intruders turned on the light illuminating the staircase. The shorter intruder then said, "Shoot him. Let him know what I'm talking about. Let him know we're not playing." Then this intruder asked Dorsey, "where is, is the stuff?"
 {¶ 7} Dorsey testified that he did not know what "the stuff" referred to, but that he indicated that it was upstairs, because Dorsey had a gun under the bed in the master bedroom upstairs.
 {¶ 8} The party proceeded upstairs, and Dorsey went down on the floor and reached under the bed. He got his gun and attempted to get a bullet from the magazine into the chamber of the gun, a 9-millimeter Ruger semi-automatic. At this point, perhaps in response to the sound of Dorsey's chambering a round, he was shot in the leg. Dorsey was able to return fire:
"Q. Now, you said you were able to return fire. Do you know if you hit one of the assailants?
"A. Yeah. I knew I hit —
"Q. How do you know you hit one of them?
"A. I heard him whimpering.
"Q. Like a moan?
"A. Yes.
"Q. Do you know if it was the taller or the shorter assailant that got hit?
"A. It was the taller.
"Q. The one who was in front?
"A. Yes.
"Q. What happened next?
"A. Then they took off. And I tried to get up at that time but I couldn't move as fast, as my leg was stiff. And I ran to the front window to seeif I could see them running out.
"Q. Did you shoot another bullet before they had managed to run out the bedroom?
"A. Yes, I think.
"Q. How many times did you fire your gun?
"A. During the — I know I shot at least twice but the gun jammed. So during the whole situation, I really don't — "
At another point in his direct testimony, when Dorsey was explaining why he later put his gun at the back of the fence behind the apartment, he testified:
"I don't know if anybody else had gotten shot other than me at that time."
On cross-examination, Dorsey testified:
"Q. You just took a shot?
"A. Yeah. I mean, I shot one of the guys. I don't know who he was, but I did shoot one.
"Q. You're for sure you shot one of them.
"A. I could hear him being shot because of the whimper."
 {¶ 9} Rogers, Dorsey's girlfriend, was able to hear much of what was going on in her apartment on her cell phone. Dorsey had dropped his cell phone, but it was still transmitting. Rogers had the friend she was with call 911, then switched phones with her friend. The initial response to the 911 call seems to have been that a call would have to be placed from the area where the events had occurred. Rogers then called her friend's boyfriend in Miamisburg, who placed the call summoning the police.
 {¶ 10} Dorsey testified that he estimated that the police arrived within five to ten minutes after the intruders fled. Dorsey, who had some marijuana and some other illicit drugs stored in the apartment, did not at first tell the police that he had shot anyone.
 {¶ 11} Meanwhile, Brown was lying in the left lane of northbound State Route 741, with a gunshot wound in his abdomen, when a motorist, Anthony Cochran, was unable to stop in time, and ran over Brown. Cochran got out of his car immediately after running over Brown, a crowd gathered, and, according to Cochran, the police got there "within seconds."
 {¶ 12} The first two police crews on the scene had been just across State Route 741, in the area of Showcase Cinemas and the Home Depot store. They had waited for a red light at the exit from the Home Depot parking lot onto State Route 741. As they proceeded to Loffer Court, and into the apartment complex, they did not see anything unusual on Route 741, even though they were in the vicinity where Cochran ran over Brown, suggesting that this event had not yet happened.
 {¶ 13} A number of police officers responded to the shooting. One of these was Miamisburg police officer Ronald Terry. As he was responding to the initial report, he heard a call referring to the person who had been struck on Route 741. When Terry arrived at the intersection of Route 741 and Loffer Court, he spoke to Miamisburg police officer Jeff Muncey, who informed him that the person lying on the street who had been run over had also been shot. Terry then went to Rogers' apartment. As Dorsey was being brought out on a gurney Terry asked Dorsey where his gun was. After hesitating "for a few seconds," Dorsey told Terry where he could find the gun. Terry denied that he had told Dorsey about the person lying on Route 741.
 {¶ 14} Because it relates directly to the evidence linking Brown to the offense, it is necessary to consider the evidence pertaining to the shots fired in Rogers' apartment. The theory of the defense was that the two perpetrators, while fleeing, encountered Brown, and shot him, thus accounting for Brown's gunshot wound. No evidence was presented to that effect. The theory of the State was that Brown had been shot by Dorsey, in the apartment.
 {¶ 15} The bullet that entered Brown's body became lodged near his spine. A medical decision was made that removing the bullet would be more likely to cause further injury to Brown, so it was not removed. There was, therefore, no way to prove that this bullet either did, or did not, come from Dorsey's gun.
 {¶ 16} Two fired bullets, and two fired casings, were found in Rogers' apartment. One of these casings and one of these bullets, according to the testimony of Timothy Duerr of the Miami Valley Regional Crime Lab, did not come from Dorsey's gun. This presumably represented the round fired at Dorsey, the bullet having passed through his leg, through the floor, and coming to rest in the downstairs living room. The gun wielded by the perpetrators was never recovered. The other bullet and casing recovered from Rogers' apartment did come from Dorsey's gun, the bullet having lodged in the wall of the apartment. This bullet was a hollow-point bullet.
 {¶ 17} Ten bullets were recovered from the 15-round magazine attached to Dorsey's gun, and one bullet was found in the chamber. Of these 11 bullets, two were hollow point bullets, and nine were not. There is no evidence in the record to indicate where the two hollow point bullets were; that is, whether the bullet in the chamber was a hollow point, and where the hollow point bullet or bullets were in the magazine. There was also no testimony indicating whether Brown's wound either was, or was not, compatible with a wound caused by a hollow point bullet.
 {¶ 18} Charles Murphy, who had been visiting with the mother of his children in an apartment at the complex, testified that he only heard two gunshots, in close succession. He also testified that the police had arrived at the scene within five minutes of the gunshot.
 {¶ 19} Another resident of the apartments, Tawanna Oglesby, testified as follows:
"Q. What was the next thing you heard?
"A. I heard a gunshot. Actually, my son heard it and he asked me, was that gunshots? I said, no. Then I heard one. It was.
"Q. Do you know how many gunshots you heard?
"A. Maybe two or three.
"Q. Were they in close succession or further apart in time?
"A. They were close."
 {¶ 20} On cross-examination, Oglesby admitted that she had told an investigating police officer that she heard two gunshots, but she reiterated that she actually heard either two or three gunshots.
 {¶ 21} Kirk J. Bell, a Miamisburg police officer, testified that he was the lead detective in this case, and that he spoke to Dorsey both on the night of the shooting, and a week later. Bell then testified as follows:
"Q. Now when you talked to Mr. Dorsey on the 26th when you had the appointment, you said there were discrepancies. You had a discussion with him about discrepancies, do you recall that? Number of shots —
"A. Yes.
"Q. He had said he had fired once?
"A. Yes. He initially had said that.
"Q. And you told him it was two shots?
 "A. I told him that the evidence would show that there were two shots.
"Q. The evidence would show?
"A. Yes.
"Q. And did you find that to be true?
"A. Yes. After we talked to him, he was upset and scared, as most people are in a shooting situation. And he just didn't remember how many times he fired."
 {¶ 22} Finally, Duerr, of the Miami Valley Regional Crime Lab, was asked whether he had ever lost a casing in a pant leg after firing a weapon, and responded, "I've gotten them caught in boots or things like that. They get behind things in the range." And Miamisburg police Bell testified as follows:
"Q. Okay. There was only one spent casing found in the master bedroom; is that correct, from Mr. Dorsey's gun?
"A. From Mr. Dorsey's gun, right. I think that's right.
"Q. If he had shot twice, presumably there would be two casings, correct?
"A. Not necessarily. Casings can get caught and picked up and transferred too many different ways.
"Q. So did you do an evidence review of the apartment?
"A. Yes. Before and after we collected evidence, yes.
"Q. And did you search?
"A. We searched that bedroom thoroughly for that second casing. We would have loved to find it.
"Q. You didn't find it?
"A. I don't believe so, no.
"* * *
"Q. Detective, casings fly off of the area where the weapon is being fired when it is fired, correct?
"A. That's correct.
"Q. And have you ever had occasion to fire a gun and not be able to find the casing afterwards?
"A. Several times."
 {¶ 23} Following a trial, the jury found Brown guilty on all counts and specifications, judgment of conviction was entered, and Brown was sentenced accordingly. From his conviction and sentence, Brown appeals.
 II {¶ 24} Brown's sole assignment of error is as follows: Appellant's conviction was against the manifest weight of the evidence.
 {¶ 25} In a weight of the evidence review, "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720-721, quoted approvingly inState v. Thompkins, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 26} In the case before us, the essential issue for the jury was whether Brown's identity as one of the two perpetrators of the offense in Roger's apartment was proven beyond reasonable doubt. From the evidence in the record in this case, there is no question that both of the perpetrators were guilty as charged, the sole factual issue being whether Brown was one of these perpetrators.
 {¶ 27} No eyewitness directly identified Brown as one of the two perpetrators. Brown's clothing and general description matched that of the perpetrators, but, as Brown notes, the descriptions of the perpetrators and their clothing were so general that they would match many people.
 {¶ 28} The State's theory was that Dorsey had succeeded in wounding one of his assailants, and that Brown's appearance, just minutes later, lying in the middle of a state highway in the direction in which the perpetrators were fleeing from the scene of the crime, with a gunshot wound to his abdomen, is strong inferential proof that Brown was the wounded perpetrator. Brown offered the theory that he had been shot by the two perpetrators as they were fleeing, but offered no evidence in support of that proposition.
 {¶ 29} The difficulty with the State's theory, as Brown notes, is that the proof that one of the perpetrators was wounded was controverted. One witness testified that he heard only two shots, and Dorsey, himself, initially told police that he had fired only one shot. Even more troubling is the fact that only two casings from fired rounds were recovered from Rogers' apartment, and these are accounted for by the bullet that struck Dorsey and the bullet fired from Dorsey's gun that lodged in the wall. The State offered some evidence that casings can wind up in clothing, or otherwise prove impossible to locate.
 {¶ 30} In his brief, Brown asserts that Miamisburg police officer Bell testified that Brown's clothing was searched for the missing casing, but it appears from our review of the record that Bell was referring to a search of Dorsey's clothing.
 {¶ 31} In any event, there is some evidence, albeit controverted, that Dorsey wounded one of his assailants. There is no evidence in the record that Brown was shot by one of the perpetrators. As the State notes, Brown's having collapsed in the middle of a state highway is suggestive that he was attempting to flee the scene.
 {¶ 32} Based upon the entirety of the evidence in the record, we conclude that the jury did not lose its way, but reasonably found, from all the circumstances, that Brown was one of the perpetrators of this offense. Brown's sole assignment of error is overruled.
 III {¶ 33} Brown's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
GRADY and YOUNG, JJ., concur.